IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ZAROL LEE PITTS,<br><br>                     Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>                     Defendant. | CV 16-137-BLG-SPW-TJC<br><br><br>**FINDINGS AND<br>RECOMMENDATION OF<br>U.S. MAGISTRATE JUDGE** |

On September 7, 2016, Plaintiff Zarol Lee Pitts ("Plaintiff") filed a

complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting

judicial review of the final administrative decision of the Commissioner of Social

Security ("Commissioner") regarding the denial of Plaintiff's claim for  disability

insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42

U.S.C. §§ 401-433.  (Doc. 2.)  On November 15, 2016, the Commissioner filed an

Answer (Doc. 9) and the Administrative Record ("A.R.").  (Doc. 10).

Presently before the Court is Plaintiff's motion for summary judgment,

seeking reversal of the Commissioner's denial and remand for an award of

disability benefits, or alternatively for further administrative proceedings.  (Doc. 15.)  The motion is fully briefed and ripe for the Court's review.  (Docs. 16, 17.)

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court hereby **RECOMMENDS** that the case be **REMANDED** for further administrative proceedings.

## I.    PROCEDURAL BACKGROUND

In July 2013, Plaintiff filed an application for DIS benefits, which is the subject of this action.  (A.R. 193-199.)  Plaintiff alleged he became unable to work on June 14, 2013.  (A.R. 193.)  The Social Security Administration denied Plaintiff's application initially on November 18, 2013, and upon reconsideration on February 7, 2014.  (A.R. 81-91; 92-104.)  On February 13, 2014, Plaintiff filed a written request for a hearing.  (A.R. 111-12.)  An initial hearing was set before Administrative Law Judge Michele M. Kelley (the "ALJ") on October 21, 2014, but was postponed to allow Plaintiff to obtain an attorney.  (A.R. 73-80.)  On December 18, 2014, Plaintiff appeared with counsel at the rescheduled hearing, and testified before the ALJ.  (A.R. 39-72.)  On February 13, 2015, the ALJ issued a written decision finding Plaintiff not disabled.  (A.R. 18-27.)  Plaintiff requested review of the decision on April 15, 2015.  (A.R. 7-14.)  The ALJ's decision

became final on July 8, 2016, when the Appeals Council denied Plaintiff's request

for review.  (A.R. 1-5.)  Thereafter, Plaintiff filed the instant action.

## II.    LEGAL STANDARDS

### A.    Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial

review of the Commissioner's final agency decision.  42 U.S.C. §§ 405(g),

1383(c)(3).  The scope of judicial review is limited.  The Court must affirm the

Commissioner's decision unless it "is not supported by substantial evidence or it is

based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  *See*

*also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may

reverse the ALJ's decision to deny benefits only if it is based upon legal error or is

not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human*

*Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a

preponderance."  *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d

1064, 1066 (9th Cir. 1997)).  "Substantial evidence is relevant evidence which,

considering the record as a whole, a reasonable person might accept as adequate to

support a conclusion."  *Flaten*, 44 F.3d at 1457.  In considering the record as a

whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary."). However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

## B.    Determination of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) he suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve

months or more, or would result in death; and (2) the impairment renders the

claimant incapable of performing the work he previously performed, or any other

substantial gainful employment which exists in the national economy.  42 U.S.C.

§§ 423(d)(1)(A), 423(d)(2)(A).  A claimant must meet both requirements to be

classified as disabled.  *Id.*

The Commissioner makes the assessment of disability through a five-step

sequential evaluation process.  If an applicant is found to be "disabled" or "not

disabled" at any step, there is no need to proceed further.  *Ukolov v. Barnhart*, 420

F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec.*

*Admin.*, 223 F.3d 968, 974 (9th Cir. 2000)).  The five steps are:

1. Is claimant presently working in a substantially gainful activity?  If so,
   then the claimant is not disabled within the meaning of the Social
   Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b),
   416.920(b).

2. Is the claimant's impairment severe?  If so, proceed to step three.  If not,
   then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(c),
   416.920(c).

3. Does the impairment "meet or equal" one of a list of specific
   impairments described in 20 C.F.R. Part 220, Appendix 1?  If so, then the
   claimant is disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§
   404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work?  If so, then the claimant is not disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Although the ALJ must assist the claimant in developing a record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step.  *Tackett*, 180 F.3d at 1098, n.3 (citing 20 C.F.R. § 404.1512(d)).  At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience."  *Id*. at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

## III.   FACTUAL BACKGROUND

Plaintiff claims to suffer from severe impairments related to degenerative disc disease in the lumbar spine.  He asserts that these impairments render him incapable of performing work he previously performed, or any other substantial gainful employment.

6

**A.      The Hearing**

A hearing was held before the ALJ on December 18, 2014, and the following testimony was provided.  (A.R. 39-72.)

     1.      Plaintiff's Testimony

Plaintiff testified that he lives in a house in Laurel Montana, with his wife, two teenage daughters and one of their daughter's friends.  (A.R. 46-47.)  Plaintiff stated that his last job was working as a delivery driver for Wilcoxson's Ice Cream in Billings, Montana.  (A.R. 47.)  He explained that his back condition was causing him to have severe trouble with sitting, standing, walking, carrying product, pushing carts, and opening doors.  (*Id.*)  Plaintiff stated that his employer tried to make accommodations to keep him working, including replacing the seats in his delivery truck and sending another person on deliveries with him to help carry product.  (A.R. 48.)  Eventually, Plaintiff's pain was so bad that he resigned.  (A.R. 48.)

Plaintiff testified that his neurosurgeon recommended a hybrid surgery, which would have permitted him to return to work.  (A.R. 49.)  However, Plaintiff's insurance would not approve the surgery.  (A.R. 48-49.)  Plaintiff was offered a second type of surgery, but it was expected that even with that surgery,

he would have the same restrictions and would not be able to return to work.  (A.R. 49.)  Plaintiff testified that he had previously had back surgery in 1994, and had previously tried injections, but they did not work.  (A.R. 50-51.)  He also indicated he has tried physical therapy, but it causes more pain.  (A.R. 51.)

As for daily activities, Plaintiff stated he gets up by 9:00 a.m., and tries to sweep, start a load of laundry, or start doing dishes.  (A.R. 51.)  In between doing chores, he lies down, then will get back up for a few minutes to finish what he started, or begin another chore.  (*Id.*)  Plaintiff estimated that he could typically be up doing a chore for 1-5 minutes before he would need to lie down and rest.  (A.R. 52.)  Plaintiff stated his rest periods lasted from 20 minutes to 3 hours depending on the level of his pain.  (*Id.*)  He indicated he tries to do chores every day, but doesn't always get them done.  (*Id.*)  He relies on his daughters for a lot of help. (*Id.*)  Plaintiff is able to make simple meals, such as heating food in a microwave, but cannot stand at a stove to cook a more intricate meal.  (A.R. 52-53.)  Plaintiff also reads, watches television, looks at Facebook or plays games, but he lays down while he does these activities.  (A.R. 54.)

Plaintiff only drives occasionally, as he finds it too painful to be in a vehicle for more than 15 to 20 minutes.  (A.R. 53.)  It was noted during the hearing that

Plaintiff was "up and down and kneeling and standing and leaning and not a whole lot of sitting." (A.R. 54.) Plaintiff indicated sitting was difficult for him, and that he usually finds something to lean up against. (*Id.*) He stated he can walk about 100 feet, and stand for approximately 5-6 minutes before needing to find another position. (A.R. 55.) Plaintiff testified that he cannot lift more than a half-gallon of milk. (*Id.*) Plaintiff estimated that he spends 85-90 percent of his waking hours lying flat due to pain. (A.R. 57.) Plaintiff stated that it is very seldom that he goes to the grocery store. (A.R. 60.) He reported the last time he had gone to the store alone was approximately 10 days before the hearing. (*Id.*) He had gone to Walmart to purchase a single cake mix, and afterwards he had to lie down the rest of the night. (*Id.*)

Plaintiff stated his pain is in the lower area of his spine, and he gets nerve pain down his hips and thighs. (A.R. 55-56.) The pain affects his ability to walk, stand, kneel, and bend over. (A.R. 56.) Plaintiff also stated his feet go numb daily. (*Id.*) He indicated he has not fallen, because he is pretty good about catching himself or being close to something so he can get off his feet. (A.R. 57.) Plaintiff also noted that some days he cannot wear shoes because of the pressure they create. (*Id.*)

Plaintiff testified that he had not been able to afford his pain medication, and that he had to drop all of his medications except one for his thyroid.  (A.R. 58, 62.) He also stated he did not have insurance, and that his wife was unemployed.  (A.R. 61.)  Plaintiff said that after he stopped working, he relied on his IRA's and savings accounts to pay for his medications for about 3 months, but could not afford to keep it up.  (A.R. 63.).  The ALJ asked if he had looked into no or low cost prescription programs, and he answered affirmatively.  (A.R. 62.)  However, Plaintiff stated that he cannot afford it, even if the prescriptions were only $5.00. (*Id.*)  The ALJ appeared incredulous, asking him how much the cake mix cost that he recently purchased from Walmart.  (*Id.*)  Plaintiff explained he purchased the cake mix with a food stamp card.  (*Id.*)

    2.   <u>Vocational Expert's Testimony</u>

Delane Hall, a Vocational Expert, also testified before the ALJ.  (A.R. 64-71.)  The ALJ asked Mr. Hall four hypothetical questions.  First, the ALJ asked Mr. Hall to assume a person the same age as Plaintiff, and with the same work history and educational background, who could lift 10 pounds frequently, and 20 pounds occasionally, walk, stand and sit 6 hours in and 8-hour workday, periodically alternate between sitting, standing and walking with normal work

breaks, frequently climb ramps and stairs, balance, kneel, crouch and crawl, occasionally climb ladders, ropes and scaffolds and stoop.  (A.R. 66.)  Mr. Hall testified that the individual would not be able to perform any of Plaintiff's past jobs, but that there would be jobs in the national economy that such a person could do, including small parts assembler, escort driver, and storage rental clerk.  (A.R. 67.)

Second, the ALJ asked Mr. Hall to assume the same person, but with the limitation that the person can walk and stand for only 4 hours in an 8-hour day.  (A.R. 68.)  Mr. Hall stated that the individual would be able to perform all of the same jobs.  (*Id*.)

Third, the AJL asked Mr. Hall to assume the same person, but with the limitation that the person could sit for only 4 hours in an 8-hour workday.  (*Id.*)  Mr. Hall testified that the individual would be able to do the job of small parts assembler and storage rental clerk, but not escort driver.  (*Id.*)

Finally, the ALJ asked Mr. Hall to assume the same person, but with the requirement the person would be off task 20% of an 8-hour workday due to pain and associated symptoms, including fatigue.  (A.R. 69.)  Mr. Hall stated no jobs would be available.  (*Id.*)

11

Plaintiff's counsel asked Mr. Hall if it would be an issue for a person to have to change positions every 10 minutes.  (A.R. 70.)  Mr. Hall indicated it would. (*Id.*)  Plaintiff's counsel then asked Mr. Hall to assume the same hypothetical person described by the ALJ, but who was limited to standing and walking 2 hours total, sitting 2 hours total and the other 4 hours laying down.  (A.R. 71.)  Mr. Hall stated that it would preclude substantial gainful activity.  (*Id.*)  Finally, Plaintiff's counsel asked Mr. Hall to assume a person who had to repeatedly lay down for 20 minute periods.  (*Id.*)  Mr. Hall said that would fall under the ALJ's fourth hypothetical, and would preclude work.

**B.    Medical Evidence**

The administrative record also includes Plaintiff's medical records from the following health care providers.

1.    Treating Physician Evidence

a.    *Dwight Hager, M.D*

Plaintiff saw Dr. Hagar on January 26, 2012 for a follow up appointment relating to back pain.  (A.R. 331.)  Dr. Hagar noted that Plaintiff was seeing a chiropractor but was still having a lot of discomfort.  (*Id.*)  Upon examination, Plaintiff had pain at the top of the SI joint on his left side, and along the lumbar

sacral junction area.  (*Id.*)  Dr. Hagar stated that Plaintiff did not want narcotics

because they cause a lot of nausea and vomiting for him.  (*Id.*)  Plaintiff declined

steroids for the same reason.  (*Id.*)  Dr. Hagar ordered an MRI of his hips and

lower back.  (*Id.*)  The MRI result showed no significant abnormality in the hips,

but showed "severe left-side neural foraminal narrowing at L4-L5," and "moderate

to severe neural foraminal narrowing on the right at L4-L5 and on the left at L5-

S1."  (A.R. 3328-330.)

In February 2012, Dr. Hagar referred Plaintiff to a neurosurgeon, Dr.

Michael Copeland.  (A.R. 327.)

In May 2012, Dr. Hagar saw Plaintiff on follow up.  (A.R. 326.)  He noted

that Plaintiff indicated it really hurt his back to sit for any length of time, and

Plaintiff was concerned because he had been called for jury duty.  (*Id.*)  Dr. Hagar

gave Plaintiff a note due to his back pain.  (*Id.*)  Dr. Hagar also indicated Plaintiff

was continuing with chiropractic care.  (*Id.*)

In September 2012, Plaintiff again saw Dr. Hagar.  (A.R. 325.)  Plaintiff

indicated that he was continuing to see his chiropractor and was doing fairly well.

(*Id.*)  Plaintiff reported that the only time he had a lot of pain was when he was

driving his truck for work.  (*Id.*)

b.    *Michael L. Copeland, M.D., Ph.D.*

On March 16, 2012, Plaintiff saw a neurosurgeon, Dr. Copeland.  (A.R. 350.)  Plaintiff indicated he had been experiencing pain for 4 months, and it was persistent.  (*Id.*)  Plaintiff reported the pain was in his lower back and radiated to his hips and thighs.  (*Id.*)  Dr. Copeland noted that Plaintiff's symptoms were aggravated by ascending stairs, bending, jumping, lifting, running and sitting, and they were relieved by ice, laying down, over the counter medication, stretching and rest.  (*Id.*)  Dr. Copeland diagnosed Plaintiff with degenerative disc disease, and recommended injections.  (*Id.*)  Plaintiff declined the injections because he had them in the past, and did not believe they would be helpful.  (*Id.*)  Dr. Copeland stated the only other option would be surgery.  (*Id.*)

On January 23, 2013, Plaintiff returned to see Dr. Copeland about his surgical options because his back pain was continuing and affecting his performance at work.  (A.R. 347.)  Dr. Copeland noted that Plaintiff had tried multiple treatments including rhizotomies, epidurals, physical therapy, chiropractic, TENS unit, and medications without relief.  (*Id.*)  Plaintiff indicated he could not take hydrocodone because of nausea.  (*Id.*)  Dr. Copeland stated a recent MRI showed "nearly complete disk space collapse" at L4-5, and

"degenerative disk disease with loss of disk height and facet arthropathy" at L5-S1.
(A.R. 348.)  Dr. Copeland presented two surgical options to Plaintiff.  (A.R. 348.)
One option was a two-level fusion.  (*Id.*)  The other was a hybrid procedure, where
an artificial disc would be inserted at one level, and the other level would be fused.
(*Id.*)  Dr. Copeland stated the two-level fusion would help his symptoms, but
would likely result in long-term restrictions on lifting and bending, and would put
him at increased risk for adjacent level disease.  (*Id.*)  On the other hand, Dr.
Copeland stated that with the hybrid procedure, Plaintiff would likely be able to
resume normal activity levels.  (*Id.*)  Plaintiff indicated he strongly desired the
second option, because he did not want to lose his job.  (A.R. 349.)

Dr. Copeland provided a letter to Plaintiff's insurance company seeking
coverage for the hybrid procedure on January 23, 2013.  (A.R. 345-346.)  In the
letter, he indicated that Plaintiffs pain was affecting his overall physical function
and the ability to perform activities of daily living, such as exercise, standing,
bending, and household duties.  (A.R. 345.)  Dr. Copeland stated that in his
opinion the hybrid procedure was the better treatment because it would preserve
normal motion, and give Plaintiff full release with no restrictions.  (A.R. 345-46.)
Dr. Copeland stated he did not recommend a two-level fusion because it would

15

"likely result in the need for subsequent operations down the road, less mobility, and almost certain disability."  (A.R. 345.)  It would also lead to a permanent lifting restriction.  (*Id.*)

On May 29, 2013, Dr. Copeland saw Plaintiff again and noted that Plaintiff's insurance had refused to pay for the hybrid procedure.  (A.R. 344.)  Dr. Copeland offered to do the two-level fusion instead, but Plaintiff declined because he did not want to have permanent lifting restrictions.  (*Id.*)  Plaintiff also declined to repeat his epidural.  (*Id.*)

A June 28, 2013, letter from Dr. Copeland explained Plaintiff's surgical options, and indicated that Plaintiff's insurance denied the hybrid procedure.  (A.R. 343.)  Dr. Copeland stated that due to Plaintiff's progressing degenerative disk disease, he is unable to do heavy lifting or frequent bending.  (*Id.*)  Dr. Copeland stated that Plaintiff would have lifting and bending restrictions regardless of whether he had surgical intervention, unless he had the hybrid procedure.  (*Id.*)  Dr. Copeland also indicated Plaintiff would have his current restrictions for the foreseeable future.  (*Id.*)

/ / /

/ / /

16

c.     *Sarah M. Stewart, M.D.*

Plaintiff saw Dr. Stewart for the first time on July 18, 2013 for his back pain. (A.R. 369-374.)  Dr. Stewart noted that Plaintiff was currently unable to work, and had been fighting with his insurance for almost 2 years over the need for surgery. (A.R. 370.)  Plaintiff reported that his work requires sitting and bending, and he is unable to do so.  (*Id.*)  Plaintiff also indicated he can stand longer than he can sit, he gets numbness in his toes, and has weakness in his legs.  (*Id.*)  Plaintiff stated he took 2 narcotic pills a week, but it upsets his stomach and makes him itch.   (*Id.*) Dr. Stewart found Plaintiff had normal motor and sensory function, no focal deficits were noted, and his gait and station were normal.  (*Id.*)  Dr. Stewart stated she filled out disability forms, and planned to refer Plaintiff to occupational health for a disability workup.  (*Id.*)

On July 18, 2013, Dr. Stewart completed a "Determination of Infirmity" form.  (A.R. 367.)  Dr. Stewart stated Plaintiff was diagnosed with degenerative disk disease, and in her medical opinion he had a physical disability.  (*Id.*)  Dr. Stewart indicated Plaintiff's disability substantially impairs his ability to walk, and his psychological stability.  (*Id.*)  She stated his impairment prevents him from engaging in substantial gainful work, and that he was disabled indefinitely.  (*Id.*)

17

Plaintiff returned to see Dr. Stewart on September 13, 2013.  (A.R. 362-366.)  Dr. Stewart noted that Plaintiff had been taking some narcotic pain medication, but it made him very constipated.  (A.R. 364.)  Plaintiff indicated that if he lays on his back, he feels pain free, but as soon as he stands up, his back hurts.  (*Id.*)  Dr. Stewart prescribed a combination of Neurontin and Flexeril for Plaintiff's back pain.  (*Id.*)

On September 13, 2013, Dr. Stewart wrote a letter stating Plaintiff was completely disabled from a severe back issue, and he was "totally unable to work, until such time as he has a corrective surgery as recommended by Dr. Michael Copeland, MD."  (A.R. 386.)  Dr. Stewart noted Plaintiff has severe degenerative disk disease at L4/5, with disk space shortening and modic changes, and desiccation and loss of disk height at L5/S1.  (*Id.*)  Dr. Stewart stated his symptoms are no longer responsive to palliative interventions.  (*Id.*)

Plaintiff saw Dr. Stewart again on December 13, 2013.  (A.R. 388-397.)  Plaintiff reported his back was hurting a lot of the time.  (A.R. 388.)  Dr. Stewart indicated Plaintiff was taking gabapentin and flexeril, but not hydrocodone.  (*Id.*)  Plaintiff reported the gabapentin helped with his nerve pain.  (*Id.*)  She noted Plaintiff was unable to work due to his back pain.  (*Id.*)  A physical examination

18

revealed tenderness to palpitation in his lower back and decreased proximal

strength (4+/5) on the left side.  (A.R. 389.)  Dr. Stewart indicated Plaintiff would

continue on flexeril and gabapentin, but it was unknown when he would be able to

return to work, given his current condition.  (*Id.*)

On December 17, 2013, Dr. Stewart authored another letter reiterating that

Plaintiff was totally disabled and unable to work unless he had corrective surgery.

(A.R. 387.)

On September 30, 2014, Plaintiff returned to see Dr. Stewart for a disability

assessment.  (A.R. 398-403.)  Plaintiff reported having pain in his low back with

cramping, pain in his buttocks and thighs, and numbness in his toes.  (A.R. 400.)

Dr. Stewart's notes state Plaintiff has to rest every 10-15 minutes if he is doing

routine housework, that he has low balance and has to use the walls to walk

through his house, he cannot navigate stairs without holding on, and cannot leave

his house for more than 15 minutes.  (*Id.*)  She also noted Plaintiff used to feel best

standing, but now he felt best laying down.  (*Id.*)  Dr. Stewart's physical

examination did not reveal any abnormalities.  (A.R. 402.)  Dr. Stewart stated

Plaintiff was severely disabled due to his chronic back issues, and that he could not

work.  (*Id.*)  She stated she suspected "that he is going to struggle with any employment because he can't even sit for a short period of time."  (*Id.*)

Dr. Stewart completed a "Medical Source Statement of Ability to do Work-Related Activities," which was amended on December 2, 2014.  (A.R. 383-385; 404-406.)  Dr. Stewart opined that Plaintiff could lift 10 pounds continuously, carry 10 pounds frequently, but could never lift or carry more weight.  (A.R. 405.)  Dr. Stewart found Plaintiff could sit for 30 minutes, stand for 10 minutes and walk for 10 minutes at one time without interruption.  (A.R. 384.)  She further opined that he was limited to sitting, standing and walking for 60 minutes in an 8-hour work day.  (A.R. 406.)  She stated he did not require the use of a cane.  (A.R. 384.)  Dr. Stewart also opined that Plaintiff can never operate foot controls with his left or right feet because his pain radiates into his spine and legs.  (*Id.*)  Dr. Stewart stated Plaintiff cannot work or be active without severe pain.  (*Id.*)

###### d.   *George Morales, M.D.*

Plaintiff saw Dr. Morales at the Laser Spine Institute in Scottsdale, Arizona for evaluation of his back condition on December 19, 2012.  (A.R. 313-323.)  Dr. Morales' notes indicate Plaintiff had low back pain, buttock pain, burning, numbness and tingling, bilateral leg pain, and balance problems.  (A.R. 313-14.)

20

Plaintiff's pain increased with sitting.  (A.R. 313.)  Upon physical examination of Plaintiff's spine, Dr. Morales indicated hyperextension was painful and limited, lateral flexation was painful and there was positive left facet loading.  (A.R. 315.) Dr. Morales also noted Plaintiff had a positive straight leg test on the left side. (*Id.*)  Dr. Morales ordered x-rays and an MRI.  (*Id.*)

e.     *Paul G. Gaitan, M.D.*

On December 20, 2012, Dr. Gaitan from the Laser Spine Institute reviewed Plaintiff's x-ray and MRI results.  (A.R. 311-312.)  Dr. Gaitan stated the MRI showed degenerative disk disease, bulging disk, foraminal stenosis, facet degen/hypertrophy, osteophytes and post-operative changes at L4/5 and L5/S1. (A.R. 311.)  The x-rays also showed degenerative disk disease at L4/5 and L5/S1. (*Id.*)  Dr. Gaitan stated Plaintiff may be a candidate for minimally invasive stabilization surgery ("MISS"), but was not a candidate for another procedure offered by the Laser Spin Institute referred to as "ESS."  (*Id.*)

f.     *Chad L. Eastlick, D.C.*

Plaintiff routinely saw Dr. Eastlick for chiropractic care from January 2012 through April of 2013.  (A.R. 332-342.)  Dr. Eastlick noted that Plaintiff reported having a hard time standing up for prolonged periods of time (A.R. 336), that he

21

got sharp pain when he sits, and that he was most uncomfortable when he sits. (A.R. 339.)

2.     Examining Physician Evidence

a.     *Brian Schnitzer, M.D.*

On October 7, 2013, Plaintiff was examined by Dr. Schnitzer at the request of the Disability Determination Services of the Montana Department of Public Health and Human Services.  (A.R. 356-361.)  Dr. Schnitzer indicated he had reviewed Plaintiff's medical records dated up to June 2013, including an MRI report that showed loss of disk height in the L4-5 area.  (A.R. 356-57.)  Dr. Schnitzer noted that during Plaintiff's physical exam he seemed "uncomfortable and moved about frequently suggesting low back discomfort."  (A.R. 357.) Plaintiff also showed signs of discomfort when he positioned himself on the examination table.  (A.R. 358.)  Dr. Schnitzer stated Plaintiff voiced significant subjective discomfort of his lumbar spine at all times, at rest and with activity. (*Id.*)  Dr. Schnitzer ordered an x-ray, which showed spondylitic changes at L4-5. (A.R. 360.)

Dr. Schnitzer opined that Plaintiff's singular problem was degenerative disk disease, which was chronic and progressive.  (A.R. 358.)  Dr. Schnitzer stated he

would "imagine" Plaintiff was capable of many work-related activities, but none of

a physical nature.  (*Id.*)  He noted Plaintiff moved around constantly, indicating it

was difficult for him to get comfortable in any position.  (*Id.*)  Dr. Schnitzer said

Plaintiff was not able to squat, but standing/walking "might be possible" in a

sedentary situation, if Plaintiff were allowed to move about as he needed to.  (*Id.*)

Dr. Schnitzer concluded that "I do not know how successful this gentleman would

be in most work environments."  (*Id.*)

### 3.   Non-Examining Physician Evidence

#### a.   *Ronald Hull, M.D.*

Dr. Hull reviewed Plaintiff's medical records, but did not examine him, and

did not testify at the hearing.  He issued an opinion on February 3, 2014.  (A.R. 99-

101.)  Dr. Hull opined that Plaintiff could lift and carry 10 pounds frequently, stand

and walk 4 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday.

(A.R. 100.)  Dr. Hull stated Plaintiff would need to alternate sitting and standing as

needed for back pain.  (*Id.*)  Dr. Hull found Plaintiff could frequently climb

ramps/stairs, balance, crouch and crawl, but could only occasionally climb

ladders/ropes/scaffolds, and occasionally stoop.  (*Id.*)  He indicated Plaintiff must

avoid concentrated exposure to extreme cold, vibration, fumes/odors/gases, and hazards.  (A.R. 101.)

Dr. Hull stated there was objective evidence to support Plaintiff's allegations of pain, numbness and weakness with standing and walking.  (*Id.*)  However, he opined that Plaintiff's condition "frequently is not associated with any significant degree of muscle atrophy or weakness or objective sensory changes on examination."  (*Id.*)  Therefore, Dr. Hull concluded Plaintiff is capable of performing sedentary, light duty work.  (*Id.*)

### C.    The ALJ's Findings

The ALJ followed the five-step sequential evaluation process in considering Plaintiff's claim.   First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 14, 2013.  (A.R. 20.)  Second, the ALJ found that Plaintiff has the following severe impairment: "degenerative disc disease of the spine."  (*Id.*)  Third, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any one of the impairments in the Listing of Impairments.  (A.R. 21.)  Fourth, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to:

perform a range of light work as defined in 20 CFR 404.1567(b). Specifically, the claimant can lift, carry, push and pull ten pounds frequently and twenty pounds occasionally.   He can sit for six hours out of an eight-hour workday and can stand/walk for four hours out of an eight-hour workday with normal work breaks.   The claimant can frequently climb ramps and stairs, balance, kneel, crouch and crawl. He can occasionally climb ladders and stairs.   He must avoid concentrated exposure to extreme cold, vibration, fumes, odors, dust, gases, and poor ventilation.   He must avoid environments such as wet, slippery, uneven surfaces; unprotected heights and inherently dangerous machinery.

(A.R. 21.)

The ALJ also found that Plaintiff is unable to perform any of his past relevant work.  (A.R. 24-25.)  Fifth, the ALJ found that Plaintiff could perform light, unskilled jobs that exist in significant numbers in the national economy in light of his age, education, work experience, and RFC.  (A.R. 25-26.)  Thus, the ALJ found that Plaintiff was not disabled.  (A.R. 26.)

## IV.   DISCUSSION

Plaintiff argues that the ALJ erred in the following ways: (1) by failing to properly consider the opinions of his treating physicians (Doc. 15 at 16); (2) by improperly discrediting Plaintiff's testimony (*Id.* at 18); and (3) by failing to incorporate all of Plaintiff's impairments into the vocational consultant's hypothetical questioning (*Id.* at 30).

25

**A.     The ALJ's Evaluation of the Treating Physicians' Opinions**

Plaintiff contends that the ALJ failed to give proper weight to the opinions of his treating physicians Michael Copeland, M.D., Ph.D., George Morales, M.D., Paul Gaitan, M.D., Sara Stewart, M.D., as well as the disability examiner, Brian Schnitzer, M.D.  In response, the Commissioner argues the ALJ provided sufficient specific and legitimate reasons for assigning weight to the medical opinions in the record.

1.     Legal Standard

In assessing a disability claim, an ALJ may rely on "opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995.)  The Commissioner applies a hierarchy of deference to these three types of opinions.  The opinion of a treating doctor is generally entitled to the greatest weight.  *Id.*  ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."); *see also* 20 C.F.R. § 404.1527(c)(2).  "The

26

opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." *Lester*, 81 F.3d at 830.

"The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). "However, the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Id. See also Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability.").

If the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques, or is inconsistent with other substantial evidence in the record, it is not entitled to controlling weight. *Orn v. Astrue*, 495 F.3d 625, 631-32 (9th Cir. 2007) (quoting Social Security Ruling 96-2p). Nevertheless, in that event the ALJ must consider the factors listed in 20 C.F.R. § 404.1527(c) to determine what weight to accord the opinion. *See*

Social Security Ruling 96-2p (stating that a finding that a treating physician's opinion is not well supported or inconsistent with other substantial evidence in the record "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527.").  The factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; (5) the specialization of the treating source; and (6) any other factors brought to the ALJ's attention that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2)(I)-(ii), (c)(3)-(6).

Opinions of treating physicians may only be rejected under certain criteria. *Lester*, 81 F.3d at 830.  To discount an uncontradicted opinion of a treating physician, the ALJ must provide "clear and convincing reasons."  *Id.*  To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record."  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)*; Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  The ALJ can accomplish this by setting forth "a detailed and

thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors' are correct." *Reddick*, 157 F.3d at 725. "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831. However, "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

### 2.   Dr. Copeland

Plaintiff argues the ALJ failed to give proper weight to the findings and opinions of Dr. Copeland. However, in her decision, the ALJ gave Dr. Copeland's opinion "great weight." (A.R. 22.) The ALJ stated that Dr. Copeland's restrictions were supported by the clinically objective diagnostic evidence, and were consistent with his treatment notes. (A.R. 23.) Therefore, the ALJ adopted Dr. Copeland's restrictions that Plaintiff was unable to do heavy lifting or frequent bending into the RFC. (A.R. 21, 23.) Dr. Copeland did not specifically state Plaintiff was

disabled and could not work.  To the extent the ALJ rejected any implication in Dr.

Copeland's evaluation that Plaintiff was disabled, the ALJ did not err because she

incorporated his expressly stated limitations into the RFC.  *See e.g. Turner v.*

*Comm'r*, 613 F.3d 1217, 1223 (9th Cir. 2010) (finding ALJ did not improperly

reject medical findings of treating physician where the ALJ incorporated the

treating physician's observations into the RFC).

Accordingly, the Court finds the ALJ did not err in considering Dr.

Copeland's opinion.

### 3.   Dr. Stewart

The ALJ considered Dr. Stewart's treatment notes and letters, as well as the

"Determination of Infirmity" and "Medical Source Statement of Ability to do

Work-Related Activities" forms she completed.  (A.R. 23-24.)  The ALJ assigned

"little weight" to Dr. Stewart's July 18, 2013 "Determination of Infirmity" form

because it was inconsistent with her treatment records, appeared to be based on the

claimant's subjective complaints, and was conclusory since "there was no specific

mention to examination findings or diagnosis."  (A.R. 23.)  The ALJ also rejected

Dr. Stewart's notation on the form that Plaintiff's psychological stability was

impaired because it was outside her area of expertise and inconsistent with her treatment notes.  (*Id.*)

The ALJ also assigned "minimal weight" to Dr. Stewart's December 2014 "Medical Source Statement of Ability to do Work-Related Activities."  (A.R. 24.) The ALJ stated Dr. Stewart's opinion appeared to be based on Plaintiff's subjective reports, as there were minimal examination findings.  (*Id.*)  The ALJ also noted that there were minimal treatment records from Dr. Stewart and it appears she saw Plaintiff on a very infrequent basis.  (*Id.*)

An ALJ may reject a treating physician's opinion on the basis that a conflict exists between the treating physician's opinion and the physician's notes.  *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014).  Being mindful that the Court cannot substitute its judgment for that of the ALJ, the Court finds the ALJ gave sufficiently specific and legitimate reasons for affording less weight to Dr. Stewart's opinion.  *Molina*, 674 F.3d at 1111.  As the AJL pointed out, Dr. Stewart's physical examinations of Plaintiff showed mostly normal results.  (A.R. 364, 370, 389, 402.)  In addition, Dr. Stewart did not cite to any clinical findings to support the limitations she set forth in the "Medical Source Statement of Ability to do Work-Related Activities" form she completed.  (A.R. 383-85.)  This tends to

indicate that her opinion was based on Plaintiff's subjective complaints, which supports the ALJ's conclusion.  Further, the ALJ correctly noted that there was no basis in any of Dr. Stewart's records for her opinion that Plaintiff was limited by psychological issues.  Finally, the ALJ appropriately touched on the factors set out in 20 C.F.R. § 404.1527(c)(2-6) to determine how much weight to afford Dr. Stewart's opinions.  *Ghanim*, 763 F.3d at 1161.

Accordingly, the Court finds the ALJ did not err in considering Dr. Stewart's opinion.

### 4.   Dr. Schnitzer

The ALJ discussed Dr. Schnitzer's opinion, but failed to state what weight, if any, she assigned to the opinion.  (A.R. 23-24.)  The Court finds this constitutes error.

The ALJ must consider and evaluate any opinion by an examining physician or state agency medical consultant.  20 C.F.R. § 404.1513a (b)(1).  Further, the ALJ "must explain the weight given to these opinions in their decisions."  SSR 96-6P, 1996 WL 374180, *1 (S.S.A. July 2, 1996).  *See e.g. Foley v. Colvin*, 2015 WL 5836173, *3-5 (N.D. Tex. Oct. 2, 2015) (holding the ALJ's failure to explain the weight that he assigned to the examining consultants' opinions required reversal

and remand); *Archuleta v. Astrue*, 2013 WL 1283828, *4 (D. Colo. March 28, 2013) (holding remand was appropriate where ALJ did not articulate what weight was given to an examining psychologist).

The Court finds, therefore, that the ALJ erred with regard to Dr. Schnitzer's opinion.

### 5.   Dr. Morales and Dr. Gaitan

The ALJ briefly mentioned Dr. Gaitan's MRI and x-ray findings, but did not otherwise discuss Dr. Gaitan's records.  (A.R. 22.)  The ALJ did not address Dr. Morales' records at all.  The Commissioner has not responded to Plaintiff's argument that the ALJ failed to give proper weight to the findings of these doctors. Nevertheless, the Court finds the ALJ's omission was not erroneous.

The only documents in the record from Dr. Gaitan and Dr. Morales were treatment notes from a one-time visit to the Laser Spine Institute in Arizona, where it appears both of the physicians practice.  Treatment notes, in general, do not constitute medical opinions.  *See* 20 C.F.R. § 416.927(a)(2) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental

restrictions.").  Because Dr. Gaitan and Dr. Morales did not offer opinions

regarding Plaintiff's limitations or ability to work, their treatment notes do not

constitute medical opinions the ALJ must weigh.  *See Turner v. Comm'r of Soc.

Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (holding that where physician's report

did not assign any specific limitations or opinions regarding the claimant's ability

to work, "the ALJ did not need to provide 'clear and convincing reasons' for

rejecting [the] report because the ALJ did not reject any of [the report's]

conclusions.").  Further, the ALJ recognized the imaging results from Dr. Gaitan,

which showed evidence of Plaintiff's degenerative disk disease.  (A.R. 22.)

Therefore, to the extent Dr. Gaitan's note was relevant, it was considered.

Accordingly, the Court finds the ALJ did not err by failing to discuss Dr.

Gaitan and Dr. Morales' records.

## B.    The ALJ's Credibility Determination

Plaintiff argues that the ALJ's credibility determination was erroneous

because the ALJ made only a general credibility finding without providing clear

and convincing reasons for rejecting his testimony, and failed to consider the

impact of Plaintiff's finances on his ability to afford surgery.  The Commissioner

counters that Plaintiff waived his challenge to the adverse credibility determination

because Plaintiff's Opening Brief did not include any substantive law, argument, or factual support to support his assertion.

As an initial matter, the Court finds that Plaintiff has not waived this issue. Contrary to the Commissioner's contention, Plaintiff's brief includes several pages of argument, including citation to relevant case law regarding credibility. (Doc. 15 at 19, 24-26.) Therefore, the Court will address the issue.[1]

The credibility of a claimant's testimony is analyzed in two steps. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* Second, if the claimant meets the first step, and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if she provides "specific, clear and convincing reasons" for doing so. *Id.* "In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to

---

[1] The Court notes this is not the first case where the Commissioner has raised this argument when it was flatly contradicted by the pleadings. *See e.g. Tucker v. Berryhill*, CV-16-132-BLG-SPW-TJC (D. Mont.). Although Plaintiff's brief could be more clear, it obviously includes citation to substantive law and argument regarding credibility.

conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick v. Chater*, 157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834)).

To assess a claimant's credibility, the ALJ may consider (1) ordinary credibility techniques, (2) unexplained or inadequately explained failure to seek or follow treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989). An ALJ may also take the lack of objective medical evidence into consideration when assessing credibility. *Baston v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

Here, the first step of the credibility analysis is not at issue. The ALJ properly determined that Plaintiff's medically determinable impairments could reasonably be expected to cause his symptoms, and there is no argument that Plaintiff is malingering. Therefore, the ALJ was required to provide clear and convincing reasons for rejecting Plaintiff's testimony regarding his symptoms.

The ALJ based her decision, in part, on the fact that Plaintiff has received intermittent conservative care, is not taking his prescribed medication, and has not received additional surgeries.  (A.R. 23-24.)  The ALJ also stated Plaintiff described "fairly significant activities of daily living" that were inconsistent with his asserted limitations.  (A.R. 24.)  The Court finds the ALJ's reasons are not clear and convincing under the facts and circumstances of this case.

Pursuant to SSR 96-7p,[2] the ALJ may not "draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanation that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."  SSR 96-7p, 1996 WL 374186, *7 (SSR July 2, 1996).  "Good reasons" for a claimant's failure to seek medical treatment or pursue treatment in a consistent manner include the ineffectiveness of further treatment, intolerable side effects, or the

---

[2] Pursuant to SSR 16-3P, effective March 16, 2016, adjudicators are instructed to limit their evaluation of the intensity, persistence, and functionally limiting effects of symptoms to a two-step process that does not include a determination of claimant's credibility.  At the time of the ALJ hearing, this ruling was not yet into effect.  Therefore, the Court will review in accordance with SSR 96-7p, which was in effect at the time of the hearing and the ALJ's decision.

inability to afford treatment.  *Shauger v. Astrue*, 675 F.3d 690, 696 (9th Cir. 2012)

citing SSR 96-7p at *8.

Here, Plaintiff testified that he did not have the 2 level fusion surgery

because it was not recommended by his specialist, and even with the surgery, he

would have the same restrictions.  (A.R. 49-50.)  This was confirmed by his

treating neurologist, who explained that surgery would likely lead to additional

surgeries in the future, and almost certain disability.  (A.R. 345.)  Plaintiff also

stated that he had already tried other treatments, such as injections and physical

therapy, and they did not work.  (A.R. 51.)  Importantly, Plaintiff also explained he

was unable to have the recommended hybrid surgery because his insurance would

not pay for it.  (A.R. 50.)  He stated that after he quit working, he lost his

insurance, and was not able to pay for his medications or surgery.  (A.R. 61-64.)

The inability to afford medical treatment cannot be used as a basis for

denying disability benefits or finding a claimant's testimony not credible.  *Orn*,

495 F.3d at 638; *Gamble v. Charter*, 68 F.3d 319, 321 (9th Cir. 1995).  "The

relevant question is not whether somewhere on the planet there exists a [treatment]

that the claimant could use, if only he could afford the enormous price; rather, the

question is whether the claimant, himself, can realistically obtain such a

38

[treatment]." *Gamble*, 68 F.3d at 322. *See, e.g. Fisher v. Colvin*, 2015 WL 1442064, at *17 (E.D. Cal. Feb. 20, 2015) ("Plaintiff's failure to receive medical treatment during the period when she had no medical insurance *cannot* support an adverse credibility finding.") (emphasis in original).

The ALJ did not properly address Plaintiff's lack of ability to pay for surgery, or consider whether his lack of insurance adequately explained Plaintiff's intermittent care, his failure to take his prescribed medication, or his failure to pursue additional treatment or the second surgery offered by Dr. Copeland. In addition, the Court finds the ALJ erred by failing to set forth with specificity, which "fairly significant activities of daily living" (A.R. 24) Plaintiff purportedly can do that were inconsistent with his limitations.

In *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015), the Ninth Circuit emphasized that the ALJ must identify specifically *which* of the claimant's statements he found not credible and *which* evidence contradicted that testimony. *Id.* 493-494. Without the required specificity, the Court cannot meaningfully review the ALJ's decision to determine whether the ALJ arbitrarily discredited Plaintiff's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("[T]he ALJ must make a

credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."). *See also Mangat v. Colvin*, 2017 WL 1223881, *5 (S.D. Cal. Feb. 3, 2017) ("The ALJ failed to point to specific parts of Plaintiff's testimony he discredited.  This error alone is fatal to the ALJ's credibility determination.").

In addition, the ALJ appears to discount Plaintiff's credibility by repeatedly noting that significant limitations were not reported on physical examination, and that there were no objective findings to support Plaintiff's subjective reports of pain.  As noted above, lack of objective medical evidence can be considered when assessing credibility.  But in this case the Plaintiff's various imaging studies provide substantial objective evidence of the severity his degenerative disk disease.  In addition to other marked abnormalities, Dr. Copeland describes Plaintiff's MRI as showing a near complete collapse of the disk space at L4-5.  (A.R. 348.)

As such, the Court finds that the ALJ's credibility finding is not supported by specific, clear, and convincing reasons.

/ / /

**C.    The ALJ's Failure to Incorporate Impairments into Hypothetical Questions Posed to the Vocational Expert.**

If a claimant shows she cannot return to previous work, the burden of proof shifts to the Secretary at step five to show that the claimant can do other kinds of work. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).  The Secretary may use a vocational expert to meet that burden.  *Id.*  Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant.  *Id.*  "The testimony of a vocational expert 'is valuable only to the extent that it is supported by medical evidence.'" *Magallanes*, 881 F.2d 747, 756 (9th Cir. 189) (quoting *Sample*, 694 F.2d 639, 644 (9th Cir. 1982)).  If the assumptions in the hypothetical are not supported by the record, then the vocational expert's opinion that the claimant has a residual working capacity has no evidentiary value.  *Embrey*, 849 F.2d at 422.

As discussed above, the Court has determined the ALJ failed to adequately consider the opinion of Dr. Schnitzer or support her reasons for discounting Plaintiff's credibility.  Accordingly, these errors may have infected the hypothetical that the ALJ relied on, and in turn, the ALJ's determination at step five.  Therefore, the Court finds the ALJ's determination at step five is not supported by substantial evidence.

41

## V.      REMAND OR REVERSAL

Plaintiff asks the Court to remand this case for an award of benefits or in the alternative, remand for further proceedings.  "[T]he decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court."  *Reddick v. Chater*, 157 F.3d at 728.  If the ALJ's decision "is not supported by the record, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)).  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded.  Where, however, a rehearing would simply delay receipt of benefits, reversal [and an award of benefits] is appropriate."  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds remand for further proceedings is appropriate.  On remand, the ALJ shall properly evaluate the opinion of the examining physician.  The ALJ shall also re-evaluate Plaintiff's credibility, taking into consideration the impact of Plaintiff's lack of insurance and inability to pay for additional treatment, surgeries, or medications.  In addition, the ALJ shall reconsider whether Plaintiff can perform

42

work in the national economy based upon a hypothetical that incorporates of all the limitations supported by the record.

## VI.   CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that the Commissioner's decision be **REVERSED** and this matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of the United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to these findings must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after receipt hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 27th day of February, 2018.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge